# Cincinnati, N. O. & T. P. Ry. Co. v. Nelson.

Nov. 14, 1944.

Bradley & Bradley and B. J. Bethurum for appellant.

H. C. Kennedy for appellee.

OPINION OF THE COURT BY JUDGE REES—Reversing.

On November 18, 1942, a southbound passenger train of the Cincinnati, New Orleans & Texas Pacific Railway Company stalled in Kings Mountain tunnel north of Somerset, Kentucky, and remained in the tunnel about 'forty minutes. Mrs. Flora Nelson, a resident of Somerset, was a passenger on the train. On January 23, 1943, she brought an action against the railroad company to recover damages for injuries allegedly suffered by her. She alleged in her petition that the defendant, its servants, agents and employees negligently permitted the train, including the coach in which she was riding as a passenger, to become stalled in the tunnel and negligently suffered and permitted it to remain there for a period of approximately one hour, and that she was compelled to and did inhale smoke and poisonous gases which caused her throat, lungs, nose and head to become

greatly inflamed and irritated. On the trial of the case the jury returned a verdict for the plaintiff in the sum of $610, and, from the judgment entered thereon, the defendant has appealed. It is argued that the defendant's motion for a directed verdict in its favor should have been sustained because there was no evidence of negligence, that the court erred in refusing to give instructions 5 and 6 offered by the defendant; and that the verdict is excessive.

The appellee testified that she boarded the train at Ludlow, Kentucky, where she had purchased a ticket to Somerset, Kentucky. The engine was pulling 16 coaches. About 11 o'clock in the morning the train, as it approached the Kings Mountain tunnel, slowed down and came to a complete stop after it entered the tunnel. On this point she testified as follows on direct examination:

"Q. Just before it entered the tunnel, did anything happen to the train? A. Yes, it didn't seem like it could pull, it slowed down, kept getting slower and slower.

"Q. How long did it do that? A. I don't know.

"Q. Did you notice anything else with regard to the train? A. No, sir.

"Q. It was running slowly? A. Yes, sir.

"Q. Did it ever completely stop before it stalled in the tunnel? A. No, sir.

"Q. To refresh your recollection, did it slip? A. Yes, sir.

"Q. It slowed up before it reached the tunnel? A. Yes, sir.

"Q. And it also slipped? A. Yes, sir.

And on cross-examination:

"Q. I want you to tell this jury, Mrs. Nelson, how much difference there was in the speed of that train before it began to slow down as you say, and after it slowed down? A. Well, I don't know; it was running along about like any train runs, and then it got to slipping and slowed down is all I can tell you.

"Q. Was that close to the tunnel? A. Yes, sir.

"Q. You said something about the train slipping? A. Yes, sir.

"Q. How do you know it slipped? A. I could hear it.

"Q. How do you know it was slipping? A. I could hear it pulling, and jerking and slipping.

"Q. And that's all you know about it slipping? A. Yes, sir.

"Q. What coach were you in? A. I don't know.

"Q. Were you riding close to the back of the train? A. I just don't know which coach I was on.

"Q. You don't know whether that train in fact slipped or not, do you? A. Yes, it slipped.

"Q. What part of the train slipped? A. The engine."

The appellant introduced as witnesses J. L. Christian, the general foreman of its shops at Somerset, who was in charge of the mechanical department, J. E. McFarland, the flagman on the train, and Joe Lannigan, the locomotive engineer in charge of the train. Christian testified that the engine was inspected when it arrived in the shops and was found to be in perfect mechanical condition. McFarland testified that he was stationed on the rear end of the train, and that it was running at a speed of 15 or 20 miles an hour as it approached the tunnel. In his 35 years of experience as flagman on this railroad he had never known a passenger train loaded as the train in question was loaded to stall in the Kings Mountain tunnel. Joe Lannigan testified that he had been employed by appellant as a locomotive engineer for 43 years, and this was the first occasion during those years on which one of his trains stalled in the tunnel. The engine was not defective, and he did not know what caused it to stop. He made several efforts to start it, but was unsuccessful. It appears that an engine was detached from a train approaching from the north, was attached to the rear of the train on which appellee was a passenger, and that it pushed the stalled train out of the tunnel. There is an ascending grade as the tracks approach the entrance to the tunnel from the north.

It is appellant's contention that the doctrine of res ipsa loquitur does not apply, but if it is applicable that the evidence introduced by appellant overcame the inference to be drawn by the jury from the evidence

produced by the appellee, and that appellant was entitled to a directed verdict. As said in Watson v. Pullman Company, 238 Ky. 491, 38 S. W. 2d 430, 431: "Res ipsa loquitur—the thing speaks for itself—is but a terse way of declaring that the circumstances attending an accident are of themselves of such character as to justify an inference of negligence on the part of the one having control over those circumstances."

The rationale of the doctrine is that when the instrumentality which causes the injury is shown to be under the control of the defendant or his servants, and the accident is such as in the ordinary course of events does not happen if those who have the control use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care. Seale v. Coca-Cola Bottling Works, 297 Ky. 450, 179 S. W. 2d 598; Thompson v. Kost, 298 Ky. 32, 180, S. W. 2d 445. The effect of the application of the doctrine is not to shift the burden of proof to the defendant, but only the burden of going forward with the evidence. Here, the train was entirely under the control and management of the defendant and its servants and the accident was such as in the ordinary course of events does not happen in the absence of negligence of those having control. The evidence introduced by appellant did not, as a matter of law, destroy the presumption of negligence raised under the rule of res ipsa loquitur. It merely negatived some of the possible acts of negligence and gave rise to an issue of fact to be determined by the jury. Furthermore, there was some evidence that the train was about to stall before it entered the tunnel, and, notwithstanding this, those in charge of it permitted it to continue into the tunnel. This was evidence of negligence in addition to the mere facts of the occurrence from which an inference of negligence might be drawn. Appellant was not entitled to a directed verdict.

Complaint is made because the court refused to give instructions 5 and 6 offered by the defendant. These instructions, in effect, told the jury to find for the defendant if they believed from the evidence that the stalling of the train was due to an unavoidable accident. The court gave four instructions. Instruction No. 1 set forth the duties of the defendant, instruction No. 2 was on the measure of damages, instruction No. 3 told the

jury that nine jurors might find a verdict, and instruction No. 4 defined the term "highest degree of care." Instruction No. 1, which is not criticized, reads:

"The court instructs the jury that it was the duty of the defendant Railway Company and its agents, servants and employees in charge of and operating it at the time referred to in the evidence to exercise the highest degree of practicable care and diligence consistent with the prudent operation of said train at the time to safely convey the plaintiff to her destination, and if the jury shall believe from the evidence that the defendant Railway Company and its agents, servants and employees in charge of and operating its train at the time failed to use that degree of care and that as a result thereof, if there was such failure, the train stalled in Kings Mountain tunnel, and that the plaintiff as a result thereof inhaled smoke, poisonous gases or other fumes down her throat and into her lungs and that as a direct and proximate result thereof her lungs, throat, nose and head became inflamed or irritated and that she was thereby caused to suffer great mental and physical pain thereafter, your finding should be for the plaintiff; but unless you so believe, you will find for the defendant."

This instruction predicated the defendant's liability upon a failure to observe the duties incumbent on persons in charge of and operating railroad trains, and it concluded that if the jury believed there was a failure "your finding should be for the plaintiff; but unless you so believe, you will find for the defendant." The instructions must be confined to issues supported by evidence. There was no evidence of an unavoidable accident, and the theory contained in the instructions offered by appellant is based on mere surmise and conjecture. The converse clause of the instruction given by the court properly presented appellant's defense to the jury.

Appellant's contention that the amount of damages fixed by the jury is excessive presents a more serious question. Appellee claimed that she suffered great discomfort while the train stood in the tunnel, that for several weeks thereafter she was nervous, had difficulty in breathing, and coughed. On November 22, 1942, four days after she inhaled the smoke, she called a physician, Dr. Brent Weddle. He testified that he examined her and found that "she was suffering from

severe bronchitis, soreness of the throat and inflammation of the throat and nose, and redness of the eyes. She gave a history of having been in the train that stalled in Kings Mountain tunnel a few days previously.'' He saw her on November 27 and December 8. On his last visit ''she was up stirring about in the house.'' On January 1, 1943, he signed a statement in which he said that appellee had completely recovered and had suffered no permanent injury. At the trial several months later he testified that she had not recovered completely from the coughing. Dr. Carl Norfleet examined appellee February 5, 1943. He testified in part as follows: ''At that time, I found no evidence of soreness to the nose, nor the tongue; the throat was red; on examination of her chest, I found no evidence of mucus or rales; found no tenderness about the chest; she was in my office about an hour, and during that time, she did not cough; I saw no evidences of smothering.'' He found no evidence of a permanent injury. Dr. Weddle found that appellee was suffering from bronchitis on November 28, but he did not say it resulted from inhaling smoke.

Appellee, no doubt, suffered some discomfort during the 40 minutes the train remained in the tunnel, but her injuries were not permanent and the evidence as to pain and suffering thereafter is too slight to justify the amount of damages found by the jury. In Norfolk & W. Ry. Co. v. Robinette, 257 Ky. 558, 78 S. W. 2d 802, the plaintiff received creosote burns and was confined to his home for thirty days. He necessarily suffered severe pain. The jury returned a verdict for $500 and it was held to be excessive. In Blue Beaver Elkhorn Coal Company v. Little, 200 Ky. 822, 255 S. W. 839, a $900 verdict for injuries to a coal miner from foul air in mine was held excessive. In actions for damages for personal injuries the amount to be awarded rests largely in the discretion of the jury and courts are reluctant to interfere with their verdict, but the amount awarded must bear some reasonable proportion to the injuries sustained, and where the amount of damages allowed by the jury is obviously so disproportionate to the injury proved as to justify the conclusion that the verdict is the result of passion or prejudice or that the jury disregarded the evidence, it is the duty of the court to set the verdict aside as excessive. Here, the medical expenses amounted to $10, appellee's injury was of a tem-

porary nature, and the pain and suffering endured by her was slight.

The verdict is excessive, and for that reason the judgment is reversed, with directions to grant appellant a new trial.