## Reeb v. Lane.

March 18, 1949.

Woodward, Dawson, Hobson & Fulton and Edward J. Hogan for appellant.

Ollie James Cohen and J. L. Richardson, Jr. for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

The appellant, Arthur H. Reeb, a druggist, concedes liability for a mistake made in filling a prescription for the appellee, Mrs. Rosella Lane, but submits that the verdict of $3,000 is excessive.

The prescription was for a cough, one teaspoonful to be taken every four hours. It called for a preparation of syrup of hydriodic acid and codein sulfate. By mistake concentrated acid was used in filling the prescription. The syrup is the same substance diluted with sugar water. The evidence as to the difference in strength varies, but we may accept the analysis of Dr. Lentz an expert chemist who examined the identical medicine for the plaintiff, that it contained 18.34 percent hydriodic acid and the syrup formula usually contains from 1.3 percent to 1.9 per cent, or as he stated, the concentrated form is "over ten times" stronger. The medicine was delivered on May 14, 1945. When Mrs. Lane took the first dose, it stung and burnt her throat and strangled her. It threw her into convulsions, which resulted in a period of unconsciousness. She testified, "It started burning and it just felt like I was having spasms inside."

In rubbing her mouth she got some of the substance on her hand and then in her eye, which caused much pain and permanently affected it. Her testimony as to the effect of the medicine and her reaction to it is corroborated by her mother and sister. Mrs. Lane was then over eight months pregnant and under the care of Dr. Karraker, but he was ill and Dr. Queen, who was working with him, was treating Mrs. Lane for bronchitis. He prescribed the cough syrup after calling upon her to treat a cold.

Dr. Queen was not available as a witness, but the plaintiff's sister and mother testified that he came to visit her the next day. He tasted the medicine, spit it out, and rinsed his mouth and washed his hands. He called the druggist, the defendant Reeb, who went to the house. Reeb offered to refill the prescription, but his offer was rejected. He testified the plaintiff did not make any complaint of having suffered any ill effects from having taken the medicine sent her, but her sister says she told him she was "suffering terrible." Mrs. Lane went to the Baptist Hospital on May 17, the third day. She says Dr. Solomon had advised her to go there, but Dr. Karraker testified that Dr. Queen had her sent there where he, Dr. Karraker, was confined. Dr. Solomon had been called to the plaintiff's home that day or the day before. He found her throat inflamed with blisters and acute inflammation in her eye. He advised her to use some milk in her mouth and eyes. Learning that she was under the treatment of another physician, he asked to be excused from the case.

Dr. Karraker with Dr. Vogt, who was doing his obstetrical work while he was ill, went down to Mrs. Lane's room on the floor below. She was sick with a cold and suffering from toxic pregnancy, which causes the eyes and face to swell. It is not unusual as a woman approaches the time of her delivery. Dr. Karraker had no knowledge of any trouble over the prescription. He was interested in "her toxemia pregnancy." Both doctors testified that she was hoarse but she made no statement or complaint about having been made ill or affected by the cough medicine. They saw no burns about her mouth or anything of that kind. Dr. Karraker gave her a prescription to reduce the edema, or swelling. Taking the hydriodic acid had absolutely nothing to do with

her toxic condition. After five days in the hospital Mrs. Lane returned home, but in a day or so came back to the hospital and had her baby normally on May 26, 1945. She later brought her baby to Dr. Karraker for a check-up but never mentioned that her throat or stomach had been injured. Such is the testimony of Dr. Karraker. But Mrs. Lane and her mother say she called on him in July for her stomach trouble, and his precription was produced which called for a preparation called "bilron." Dr. Solomon stated it is a tonic to aid digestion.

The plaintiff testified to much suffering in her stomach and some mental distress and nervousness. On the trial, which occured eighteen months later, she was still suffering and had been on a diet of soft food. Previous to this experience she had been in good health. During the intervening period she had consulted several doctors. She had also consulted her lawyer, Mr. Cohen, within a month of the accident.

Dr. Solomon resumed the treatment of the plaintiff at his office on June 8, and she went there a number of times thereafter. He testified he treated an inflammatory condition in her mouth, throat and stomach. She also had conjunctivitis, which means irritation or inflammation, of her left eye and a sore mouth. She complained of her gullet, or "swallowing tube," and of severe pains in her stomach. In short, Dr. Solomon expressed the opinion that swallowing the acid had damaged the mucous membrane of the stomach and, possibly, duodenum, and that "she has from time to time open ulcers." He differs with other doctors as to the presence of hydriodic acid in the digestive juices of the stomach.

In August, 1945, Mrs. Lane consulted Dr. Burns in Cincinnati, where she had gone to live. He testified to having received a history of the case from her. He found she had an ulcer at the juncture of the upper two-thirds and the lower one-third of the stomach. It was of recent origin. It may be observed, parenthetically, that his examination was three months after the medicine had been taken. The doctor expressed the opinion that her condition was due to the effect of the acid and that relief could be had only by an operation. He made

an X-ray film which, he testified, clearly showed the ulcer. He gave the patient a diet and a bill for $180.

In May, 1946, a year later, Dr. Solomon referred the patient to Dr. Petty. She was extremely nervous and complained of tenderness "in the region of the stomach." Dr. Petty referred her to Dr. Herrmann, an X-ray specialist, and after receiving his report Dr. Petty found some symptoms and conditions which were "suggestive of the presence of a gastric ulcer," but he was far from being positive. He testified that a large percentage of people have gastric ulcers and that hydriodic acid and many other things that are irritants, naming familiar drugs, are to be found in the normal stomach.

Dr. Herrmann found congestion in the lining of the stomach and a degree of irritation at the juncture of the small intestine. He would not undertake to say what caused the plaintiff's condition or that she had ulcers.

Further testimony in behalf of the plaintiff is as to the strength of concentrated hydriodic acid and its effect upon raw meat or a denuded part of human flesh.

Dr. Kerns, a pharmacist as well as physician and surgeon of many years' experience, saw the plaintiff in February, 1946. She was nervous and complained of her stomach, particularly immediately after eating. He did not attribute her condition to swallowing the acid as she had related to him. Dr. McNeill, an X-ray specialist, examined the plaintiff at the instance of the defendant in May, 1946. Neither his nor the films made by Dr. Burns or Dr. Herrmann revealed any ulcer. Gastric ulcers come and go, while duodenal ulcers remain but get better or worse.

Dr. Helmus, testifying as an expert without having examined the plaintiff, described the characteristics of hydriodic acid. It is not a corrosive but an irritant and if it should reach the stomach, it would be diluted by saliva. It is present in the normal stomach, which is prepared to handle it and other acids. His testimony is corroborative of that given by Dr. Karraker, Dr. Vogt and others, particularly of Dr. Markendorf, a pharmacist of thirty-seven years experience. He testified that concentrated hydriodic acid was prescribed by physicians

until ten or fifteen years ago when they began calling for the diluted or syrup form because it is more pleasant to take and is less astringent. He related an experience of a member of his own household who once took some of the concentrated form of hydriodic acid without any bad effect. Dr. Markendorf and others described the effect of taking a spoonful as being like putting a green persimmon in one's mouth, producing an unpleasant, temporary condition. One will impulsively spit it out quickly, but if he should swallow it, it would irritate the esophagus, or long tube leading to the stomach, and would be diluted through its course of reaching the stomach.

The immediate discomfort and reaction to taking the spoonful of concentrated cough medicine, which the plaintiff and her mother related, were undoubtedly due to the fright and the shock operating in connection with her physical condition, described by her doctors. The conclusion is sure that if the plaintiff has ulcers in her stomach they could not have been caused by swallowing a spoonful of hydriodic acid. That is the overwhelming proof of the case. It is true Dr. Solomon and Dr. Burns expressed opinions to the contrary, but their conclusions are highly speculative. It is very significant that Dr. Queen, who called the next day, prescribed no relief and Mrs. Lane received no treatment on account of taking the medicine for three days and then only the mild remedy of applying milk, as advised by Dr. Solomon. She went to the hospital because of her toxemia pregnancy and said nothing whatever to her physicians, Dr. Karraker and Dr. Vogt, and they saw nothing to attract their attention. This case, it seems to us, is ruled by Cincinnati, N. O. & T. P. Railroad Co. v. Nelson, 299 Ky. 19, 184 S.W.2d 108. In that case the plaintiff claimed to have been seriously injured from inhaling smoke and gas of a locomotive while a train on which she was a passenger was stalled in a tunnel. Upon authority of previous cases and reason we held that a verdict of $610 in her favor was excessive.

In the present case doubtless the "passion and prejudice" under which it seems the excessive verdict must have been returned were induced in part by misconduct of the plaintiff's attorney. The court had sus-

tained an objection to his question asking the defendant if he would swallow a spoonful of the concentrated acid before the jury (see Ohio County Drug Co. v. Howard, 201 Ky. 346, 256 S.W. 705, 31 A.L.R. 1355), but the plaintiff's attorney several times in the course of his argument indirectly referred to this failure of the defendant and of Dr. Markendorf to support their testimony as to the harmless character of the drug by testing it before the jury.

We are of opinion that the verdict is excessive, and reverse the judgment.